2723, Queen's University of Kingston v. Samsung Electronics, Mr. Blackburn. Thank you, Your Honor. May it please the Court. My name is Sean Blackburn. I represent Queen's University of Kingston. Queen's asked the Court to reverse the ruling of the patent trial on the pillboard, ruling that certain claims of our patents were invalid in view of the Goldstein reference. We do so both on the merits and based on a procedural violation that occurred before the Board, which violated our due process rights under the Administrative Procedure Act. I'd like to focus my argument today on three points. First, a quick one. Let me ask you, just as a housekeeping matter. I'm correct that you're only appealing two dependent claims that relate to cellular phones, 11 and 14, and not the respective independent claims 1. That's correct, Your Honor. Okay. Thank you. And that's because of the enablement issue. Oh, yeah. Tell me why. I just wondered. But it feeds into our argument. First, the standard review. We believe it's de novo. Nuvasiv says it's de novo. What happened in Nuvasiv is exactly what happened here. New evidence was raised in reply. Nuvasiv objected, said, please either strike or allow us to file. That depends on how you look at it. I mean, there is some confusion here about the use of terminology of eye tracker and eye contact. But the concept that was described in the petition in relation to Goldstein and the way the Board treated the argument, it was that Goldstein disclosed what is now used to describe eye contact, right, which would be in terms of whether the user is looking at the screen or not looking at the screen. Right, whereas we believe eye contact is eye contact with the sensor. But to step back a minute from that, it's a de novo review, not simply because there's new evidence, but because we challenged it under the APA as opposed to the Board's rules. This Court's precedent says under the Board's, if you're challenging the Board's rules, kind of compliance with those, that's an abuse of discretion standard. We have not done that. We are challenging it under the APA. Now, to get where you were going, Judge Dyke, I think it's more complicated than that. And it's, if you look at what Goldstein says, it says eye tracking sensor. I understand the terminology. But also if you look at what they argued in their brief, they didn't just say it's an eye tracking sensor and say, oh, well, it merely detects eye contact. What they say is, and I want to get this exactly correct. Goldstein disclosed sensing eye contact by determining whether the focus of the user's pupils was on the screen's device, correct? They detected eye contact on the screen's device, not eye contact with the sensor. All eye tracking, 100% of all eye tracking. So it's basically the same thing, isn't it? It is absolutely not. And I will explain why. I can do that using... Well, first I'd like you to back up and answer my question. Sure. If you could help me. Does it disclose... Disclose sensing eye contact by determining whether the focus of the user's pupils was on the screen's device. Right. And so the question is, what is sensing, what are you sensing eye contact with? No, no, no. The answer is right. You did say right. I assume you meant correct. I actually don't. And because an eye contact sensor doesn't do that. And the thing is, all eye tracking sensors, even the ones that they long since disclaimed, would do that. The way eye tracking in its most complicated fashion happens is if you look at a screen, it does an XY coordinate, and then you track the eye's movement. And so I can take a mouse and scroll it around the screen, and at every point along the way, is eye contact being sensed? Absolutely. So in that sense, yes. But that was certainly not enabled. Why didn't Queens dispute the sensing eye contact issue at its first chance in the patent owner response? In the patent owner response?  Typically when you're raising an issue in response to the patent owner response, you're attempting to show why they failed kind of on a legalistic basis or a very clean way, like you've not met these elements of the claims. If we were to raise an enablement issue in the patent owner response, what would the board do? I have never seen a denial of an institution based on an enablement argument. Because what would the board do? If we would raise the argument, Samsung wouldn't have any opportunity to respond, there wouldn't be kind of this fulsome development of enablement. So I've never seen an institution decision denied on those grounds. So what we chose to do in the patent owner response was to make other arguments that we believe they hadn't met their burden on prima facie case with respect to some obviousness to show that there were certain elements here that were just simply not met as opposed to enablement. And we also knew that we were going to get different arguments in our response after institution, which is, you know, that's just the way it's set up. So you don't want to make the exact same arguments in those two briefs or you're probably going to be in trouble. Well, once you made the argument, they were entitled to respond to it, right? I absolutely agree, they were entitled to respond. And what the board ultimately found was that Goldstein described eye contact, that is contact looking at the screen or not looking at the screen, and that that was enabled by various other references. For example, if you look at page 34 of the board 665 decision, they talk about the smart Belando prototype disclosing flow based on gaze detection, i.e. sensing the attention of a user specifically toward the device. I agree, that's what the board found. I also would submit that they did that on a record which contained only references submitted by Samsung on the eye contact sensing issue. Right, we were not allowed to do anything other than argue against these references. We were not allowed to submit an expert declaration explaining why. I'm not understanding what's wrong here. I mean, Goldstein describes eye contact, whether people looking at the screen or not looking at the screen, and here the board finds that that's enabled. So what's the problem? We don't think it is enabled and we should have been able to explain why it wasn't enabled. You don't think this Belando enables it? I don't think it enables it. One, I don't think that the Belando, one, the only reference that shows that it works is there's a thesis that we contend shows that it doesn't work. There's an undated paper, perhaps from years later, perhaps done by people who are super skilled in the art in a lab, I think somewhere over in Europe. I don't understand how that could enable somebody looking at the patent to do it. You know, it would be one thing if it said, go to the smart Belando prototype, it was published here, it was done this. I don't think that that can suitably make an enablement argument based on something where there's not even a date. It's not even clear that it was available to one of ordinary skill in the art. I also am not convinced that it did enable it because, for one, the board dismisses this, but the processing wasn't happening on that prototype. And that prototype was not a cellular phone. It was a PDA. Those seem to be different arguments than the one you started out with, where you suggested that all they found enabled was eye tracking. But here they are specifically saying that Goldstein describes eye contact and that that's enabled by Belando. The underlying argument there is that they call that eye contact. We would consider that to actually be eye tracking and not enabled by Belando for several reasons. And we specifically asked the board to be able to address this undated Goldstein reference, as well as this kind of hybrid device that they used to say would get you the cellular phone because the Belando prototype doesn't get you there. And we were not allowed to do it. So I'm sitting here, I'm arguing with you, Judge Dike, based on an incomplete record. I didn't go back to my expert. I didn't spend $100,000 having him draft an expert declaration so that I would know coming up here to Federal Circuit Court on stuff that's out of the record. I don't have a record to argue this. I'm left arguing only what is in our patents. Well, let me ask you this. Despite 665's distinction between eye contact sensors and eye trackers, Claim 1 doesn't limit how, quote, the device determines where the user is looking. My reading of the asserted claims on appeal for purposes of whether Goldstein anticipates leads me to conclude that the distinction between eye contact sensors and eye trackers could be irrelevant to our analysis because both are covered by Claim 1 and Claim 1 isn't challenged on appeal. They both would be covered by Claim 1, but eye tracker, like true eye tracking, is not enabled on a cellular phone. In fact, Samsung totally disclaimed that before the board. They, in fact, said, no, no, we never even argued that it was eye tracking because eye tracking requires more computational power than you would have had on a cellular phone of that generation. And that's the distinction. The distinction is not in the claim that the hardware sensor is the enablement issue. You couldn't do eye tracking in or on a cellular phone at that time, which is why, in reply, they switched to eye contact sensing because it requires less power. And I see that I am now into my rebuttal time. There are no further questions. Well, I'm troubled by the argument that Queens makes regarding what it says is the effective denial of Queens' motion to strike or any alternative file a certify with evidence. You were permitted to file a certify, and quite outside the norm, you got the last bite at the apple in argument. We were denied the ability to reply to file a certify with evidence. I know that. And that's the key. That's newvasive. Newvasive says. So they were denied both the ability to file a certify and evidence in newvasive. If you read newvasive, it only talks about the certify. I've gone back to the record. I've gone back to the briefing. Their argument was certify and evidence. And if you look at Judge Trano's opinion in there, he says over and over again that they were denied that one of the keys is that they were like these observations that he talks about. They do not substitute for the ability to supply argument and evidence, including expert declarations. And the reason for that is if I'm able to argue as an attorney against a 68-page declaration with 65 new pieces of evidence, I can argue against it all day. But that can be dismissed as simply attorney argumentation. And you're in the position where I've been in today that I'm simply arguing from our patent attempting to explain why we think this was wrong because we were not able to put any of this evidence in the record. Okay. Do you want to say the rest or no? Thank you, Your Honor. Mr. Countryman. May it please the court. Craig Countryman for Samsung. The board was correct to permit Queen's from submitting additional expert testimony. Samsung's petition put Queen's on notice of the relevant issues, and Queen's could have submitted evidence on them with its patent owner response. But instead, Queen's avoided those topics, probably because it was worried about undermining the enablement of its own patents, which use the same IBM eye-sensing technology to sense eye contact that Goldstein uses. Queen's experts also admitted other facts from their initial expert declarations that hurt Queen's' case. And so having passed on that initial opportunity to submit evidence on those issues, the board correctly denied Queen's a second chance to do so. I'd like to spend most of my time showing that they did have notice of the relevant issues, pending, of course, other questions from the court. But before I do that, I do think it's worth noting what the board did give Queen's. As the court pointed out, Queen's got a surreply where they could make whatever arguments they wanted. They were allowed to cross-examine our reply expert for seven hours. And during that time, they could have introduced whatever impeachment materials that they thought might support their case. They were permitted to file observations. And ultimately, they did get the last word on enablement at oral argument. So the question now is, in addition to all of those other things, did the board nevertheless err in denying them the ability to submit evidence? And we submit that it did not. The key issue here seems to be whether they were on notice that it was our theory that Goldstein disclosed sensing eye contact. And our petition absolutely put them on notice. In the discussion of Claim 1 in the petition, at Appendix 193 and 194, we set out clearly that Goldstein disclosed... So we absolutely didn't do that. The petition was clear that our theory was sensing eye contact. And yes, these Goldstein sensors, we say they're eye-tracking sensors, 20. But the way they worked to implement the feature that was alleged to anticipate, the pause and resume feature, we said was sensing eye contact. And we made that clear first by saying that there's this two-state detection, right? Are you looking at the device or not looking at the device? And that, as their own patent says, is eye contact. Eye tracking, by contrast, is when you're looking at the movement of the eyes and the trajectory or the eyes moving up and down. Whereas eye contact is just this instantaneous determination. Are you looking there or not? And so we certainly laid that out in the petition. And certainly, given that that's the same way their own patent characterizes it, they were absolutely on notice. But then, as the court alluded to, so claim one includes both eye tracking and eye contact. And so we laid out this theory explaining the sensing eye contact. But then some of Queens's dependent claims actually do narrow down and require certain types of sensing. And so, for example, with respect to their claim four of the 665 patent, at appendix 201 in the petition, we flatly said, Goldstein discloses sensing eye contact. And we used to support that the same parts of Goldstein that we had cited in connection with claim one. And then, even further, there are more dependent claims, claims five and six of the 665 patent. And so claim four actually is a long list. It says sensing a number of things, eye contact, eye movement. And incidentally, so eye movement is their patent equates it to eye tracking. And in connection with claim four, we didn't say Goldstein disclosed sensing eye movement in connection with claim four. And so that's another clue to them, right, that our theory is eye contact, not eye tracking. But then there's some additional dependent claims in their patent that are narrow specifically to just eye contact. And so we said Goldstein disclosed that. And so the onus would have been on them, in the patent owner response, to challenge that disclosure in Goldstein. And they didn't do it. And so now, and, you know, there was a strategic reason for them to do it. I mean, whatever the reason, they were on notice. And so that's enough under the APA to comply with due process. But there was a strategic reason. When you say they were on notice, but what about this enablement issue which they raised? And in response to your reply, you introduced a new expert that was not an expert you relied on before. He filed either a 65 or 68 page declaration. I can't remember which. And then he also attached or you attached 65 new pieces of prior art. That's a lot. That's a lot of new evidence in a reply brief. A whole new declaration by a whole new expert, not using the expert you'd used before. And then 65 or 68 new pieces of prior art for the board to look at. They were given a certify, but they were given no opportunity to introduce any competing evidence. Should they have been? And if not, why not? So no, or I would say the board has discretion not to allow them to put in new evidence. And the reason is because their experts could have addressed all those points with the patent owner response. How could they have addressed them with the patent owner response? You introduced 65 new pieces of prior art. How could they address those pieces of prior art or have an expert opined on them when they weren't part of the IPR until you introduced them in the reply? So a couple things. There were a couple different issues that prior art went to. The first was kind of further discussion that Goldstein discloses sensing eye contact. And that was something they certainly could have addressed because we put that in the petition. And yes, we put in a new expert to kind of elaborate on that. But it was the same theory that was in the petition. And they, I think, made a strategic decision not to have their experts address it because they were worried about calling the enablement of their own patent into question. Most of the other evidence... When was the enablement issue first raised by them? In their patent owner response after institution. So was your reply, was the first opportunity you had to address the enablement question? Yes, that's correct. That's correct. And so to the rest of the evidence. So the other evidence... So if that's your first opportunity to address the question, then how could they have been expected prior to you having addressed the question? How could they have anticipated what you would say and put in all the evidence responsive to the 65 prior art references and the new expert declaration when you had never previously addressed the question and they had no idea what your response would be? So I think you have to look at their three specific complaints, which are 37 and 38 of the blue brief. So the first thing is they say there was a shift in theory about whether Goldstein disclosed sensing eye contact. We didn't shift theories. As I explained, it was in the petition. We said explicitly sensing eye contact. But the other stuff, these were issues that their experts actually injected in the proceeding about the state of the prior art, for example, and what the capabilities of cellular devices were at the time. And for that, we were putting in new evidence, but it was really to correct understatements by their experts. I mean, their experts took the position that cellular devices at the time, for example, I think they said the state-of-the-art device only had 206 megahertz in processing. And so we put in reply evidence to say, well, no, no, no. Actually, there's all these other public sources that say, for example, the TKIT83 device had 300 megahertz. There were some others that had 400 megahertz. And so these were the types of things that they could have anticipated because they injected the issue into the proceeding. And if they were going to do that, their experts had a responsibility to address all the prior art that was out there. Instead, there was a decision. All prior art that was out there, but that wasn't part of the proceeding. Yes. Wait, you're telling me, let me get this straight. You're telling me that their expert had an obligation to go through all prior art in existence and address all of it even though you hadn't relied on any of it yet? I think their expert had... Doesn't that seem like that might be a slightly onerous burden to place on someone? Sure. So let me put a finer point on it. Are you actually saying that their expert had an obligation to be accurate? Exactly. Having made a representation about the state of the prior art and saying 206 megahertz is the best, they had an obligation to look and see, well, is there anything else out there that would contradict that? They raised the enablement question for the first time in their response. And they put in expert testimony about that, right? Correct. And you were responding to that, right? Correct. The question is whether they should get a reply to that since they had the opportunity to address the enablement question when they raised it for the first time in their response. Correct. Exactly. And on that point, I mean, it's common for the party here. We had the burden of proof. And the common practice is for the party with the burden of proof to get the last word. In your brief, you argued they had the burden of production on the enablement question, right? That's true. They had the burden of production, but we ultimately had the burden of proof. So they had the burden of production on the enablement question, so they introduced it. You responded. Did they get what someone would normally get in the form of a reply? Were they given all the same protections someone else with a reply would be given? I think so. Let me give you a hypothetical example. Suppose this is obviousness. You have the burden on obviousness, if you are the person challenging the patent. You put out your prima facie case on obviousness. Now suppose the patentee comes along and introduces responsive evidence. In your reply, are you allowed to introduce new evidence? I think so, Your Honor. I think we could respond to their evidence. For example, if the patentee put in evidence of commercial success, I think we could come in with specific evidence and say, actually, no, the product wasn't commercially successful. If you said the sales were $200 million, actually they were $50 million. I think there's an ability to call them on some of the representations they make in reply, and I think they have an obligation to be accurate and wholesome in their submission, so that if we call them on it, the board has discretion to say, well, they don't get a second bite at the apple, and that's what happened here. They made representations about the state of the prior art. I think that you're misunderstanding, because my point was the person who has the burden of going forward initially is them on this enablement issue, so they really stand in the same shoes you would on obviousness, theoretically. So if on obviousness you present all of your arguments, but they present opposition, if you then in reply get a chance to respond with new evidence responsive to their opposition, then why shouldn't they get a chance in reply to respond with new evidence responsive to your opposition on enablement? It's like you want one standard for you, but a different standard for them when they have the burden on the issue. I mean, throughout your brief you made it clear to me they have the burden on this issue. No, I mean we have the burden of proof. No, on enablement, the burden of production. They have the burden of doing it. They have the burden of production, but we ultimately have the burden of proof, and so I think as in the obviousness context, the party with the burden of proof is the party that typically gets the last word. I think the board would have discretion to say, looking at the particular facts, that yes or no, we'll give you expert testimony, but here I don't think the board would use that discretion because ultimately all we did in reply was just put in evidence that was responsive to them and that corrected some of the misstatements by their experts that had their experts done a more thorough job initially, they would have addressed all the relevant evidence about the state of the technology at the time and the state of this Valiando prototype. I take issue with your use of the word thorough. I think it should be accurate. I accept that. I agree with that. So that's our view on the procedural issue. Did they address the Valiando prototype in their response to which you were responding? I'm sorry. What was that? Did they address the Valiando prototype in their response? Yes. So they were the ones that raised it. They raised it and you were responding to it. We were responding to it and we said, and we cited another paper on it that actually told a different story about it and they didn't object to the province of that paper. They now say, oh, it's unpublished, we don't know when it was from. They never objected to the authenticity below, and actually if they were interested in that they could have cross-examined our expert on it who was the one who discovered the paper, and actually if you Google the paper it shows it's from the relevant time, it's publicly available. But, yes, again, this was an issue they raised and we were responding so there was no notice problem and ultimately the board had discretion, we believe, to especially having given them the SIR reply, having given them seven hours to cross-examine, having given them the last word of argument, had discretion to draw the line there and not permit them to put in additional evidence. When you say they didn't object to authenticity, they raised no foundational objections. That's right, Your Honor. In their motion to exclude, they had relevancy objections, but there was no foundational authenticity or anything like that. So, unless there are further questions on the procedure, I could speak briefly to the merits, and there we just think it's really a substantial evidence question on both issues. There's two issues, whether Goldstein actually discloses all the limitations and then the enablement. On the disclosure of the limitations, figure one of Goldstein shows the sensor on the device and our expert explained it's in a known positional relationship with the device. The board credited his testimony, substantial evidence supports that finding. And then on the enablement, the board credited all our experts' explanation of the state of the art, the sensors that were available, the processing capabilities of cell phones that were available, the fact that Baleando was a success and not a failure, and so given those underlying factual findings, the board correctly found Goldstein enabled. If there are no questions, thank you. I'd like to make two quick points in reply. We've heard a lot about how we couldn't attack enablement because our patents wouldn't be enabled. False. Our patents actually disclose something Goldstein doesn't, something that's completely different. As you are aware, you detect a pupil and you detect a glint. This is this underlying Morimoto technique. That's not eye tracking, that's just the first step. When you're doing eye tracking or eye gaze detection, which is what Goldstein is, looking at a point on the screen, you then have to do a geometric computation to see exactly where the glint in the eyes is and then figure out, based on the shape of that glint, where I am looking. So if I'm looking over here, the glint looks different, or over there. It's a geometric computation, requires calibration, requires a fixed environment. What our inventor realized, his eureka moment, was that if I'm looking at you, Judge Dyke, you can see my pupils, and you can see the glint in my eye is inside the pupils because it's a direct line. And you eliminate the need for all of that geometric computation. We disclose that in our patent. It's in Figure 2. It's also at Column 7 on Appendix 163, from Line 30 until about Line 35. For example, when the user is looking at the camera, the glint inside the pupil, the pupil, the glint in the camera, are all aligned on the axis, indicating that the user is looking at the camera, and hence eye contact is detected. That's something very different. Goldstein does not disclose that, so we didn't rise and fall with Goldstein. Now to the notice issue. We heard a lot of argument about there were clues. I submit that more than clues are required as to whether or not they're looking at eye contact sensing. No, no, no. You're misstating your opposing counsel's argument. He said clues, and he said also direct information. But that is absolutely incorrect, and I will explain why. Claim 4 was not one of these claims. They said that it was an eye-tracking sensor. They said that it was performing eye tracking to sense the attention. One of the things it did in doing that sensing attention was sensing eye contact as part of eye tracking. They just claimed all of it. That wasn't what the board relied on. That wasn't in their file. The other point is that because it's in Claim 6, that's not putting us on notice of this hardware sensor limitation. That's the Americam case that we cite. In that case, it was an obviousness case. They say Stiles renders all the claims obvious. Then they put together a chart with 20 claims. Three of them don't cite to Stiles. In the reply, they then rely on Stiles for those three. This court in the Americam case that came out, I think, about eight or nine months ago, said that's not enough. You've got to raise this specifically with these claims. They said this is an eye tracking sensor performing eye tracking. We were entitled to believe them. If you look at page 194 of the appendix and 202, they specifically describe in the petition monitoring attention toward the screen. I agree. But we believe that that is eye tracking. This is about the procedural argument, not the evidence. In our view, attention toward the screen is eye tracking? It's not simply attention toward a screen. The point on the screen is what Goldstein discloses. They say it's an eye tracking sensor. If you look at 194, in the middle of the page, it says Goldstein disposes a hardware sensor in and on the device for sensing attention of a user specifically toward the device. That sounds like eye contact. Then on 202, it's even more specific. They said it was being done by an eye tracking sensor that actually tracks the eyes. Looking beyond that on the evidentiary points, there's no conceivable way that we could have responded to this evidence. In fact, even if we could have found the thousands of pieces of evidence out there, the board also relied on Dr. S's self-described work with Dr. Myron Flickner. We could not possibly have responded to that. It's fundamentally unfair for the board to have relied on that evidence and not give us any chance to rebut it. I see that I'm out of time, so if there are no further questions. Okay, thank you. Thank you, counsel, the case is submitted.